IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGDALINE DEROSENA )
) Case No. 06 C 4893
Plaintiff, )
) Judge Virginia M. Kendall
v. )
)
GENERAL BOARD OF PENSIONS & )
HEALTH BENEFITS OF THE UNITED )
METHODIST CHURCH, INC., )
DEBBIE REID AS MANAGING DIRECTOR, )
PAULA EVANS AS TEAM LEADER, and )
GERTRUDE LIVERNOIS AS MANAGING )
DIRECTOR, )
Defendants. )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Magdaline Derosena ("Derosena" or "Plaintiff") filed suit against defendants

General Board of Pensions & Health Benefits of the United Methodist Church, Inc. ("the Board"),

Debbie Reid, Paula Evans, and Gertrude Livernois (collectively, "Defendants") under Title VII of

the Civil Rights of 1964 ("Title VII") and 42 U.S.C. § 1981. Derosena asserts the following four

claims: (1) gender discrimination against the Board in violation of Title VII; (2) national origin

discrimination against the Board in violation of Title VII; (3) national origin discrimination[1] and

retaliation against Defendants in violation of 42 U.S.C. § 1981; and (4) retaliation against the Board

---

[1] In Count III, Derosena alleges that Defendants discriminated against her "because of her race[,] Haitian." (Am. Compl. ¶ 35.) Her claim, however, concerns discrimination that she allegedly experienced because of her ancestor's place of origin as well as the characteristics she possessed as a result of her membership in the Haitian national origin group. Thus, the Court construes Derosena's § 1981 discrimination claim as one based upon national origin discrimination rather than race discrimination. *See Abdullah v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008) ("Race, nationality, and ethnicity are sometimes correlated, but they are not synonyms.").

1

in violation of Title VII. Defendants now move for summary judgment on all claims. For the reasons set forth below, Defendants' Motion for Summary Judgment is granted.

## STATEMENT OF UNDISPUTED FACTS

Derosena is a Haitian female who worked as a member of the Board's Pension Administration Team (the "PAST team") from February 2001 through December 18, 2006, when she was terminated.[2] (Pl. 56.1 Resp. ¶¶ 1, 15, 42.) The Board administers pension and retirement funds of The United Methodist Church, Incorporated. (Pl. 56.1 Resp. ¶ 2.) As a PAST team member, Derosena helped administer the records of various retirement accounts administered by the Board. (Pl. 56.1 Resp. ¶ 16.) From February 1, 2001 through May 2005, PAST Team Leader Paula Evans ("Evans") served as Derosena's immediate supervisor. (Pl. 56.1 Resp. ¶ 5.) Evans is a non-Haitian female. (*Id.*.)

In June 2002, Evans completed a performance evaluation of Derosena. (Pl. 56.1 Resp. ¶ 18.) In the evaluation, Evans rated Derosena as marginally meeting the requirements of her job and noted, among other things, that Derosena: (1) performed below her abilities; (2) showed minimal initiative about her work; (3) did not make sufficient effort to analyze complex problems; (4) exhibited carelessness; and (5) did not consistently plan and prioritize her work to ensure that goals were met. (*Id.*; Def. Ex. C, Derosena Dep. Ex. 5 at 1.) Subsequently, in a December 2002 performance evaluation, Evans once again rated Derosena as marginally meeting her job requirements and noted that: (1) on numerous occasions, work items had to be returned to Derosena for corrections of careless errors; (2) Derosena needed to develop her analytical skills; (3) Derosena

---

[2] Citations to "Plaintiff Derosena's Response to Defendants' Statement of Facts and Its Additional Facts" have been abbreviated to "Pl. 56.1 Resp." Citations to "Defendants' Response to Plaintiff's Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment" have been abbreviated to "Def. 56.1 Resp."

needed to focus on ensuring that her communications were clear and concise; and (4) in the future, Evans expected Derosena to plan and prioritize her work.  (Pl. 56.1 Resp. ¶ 20.)

Approximately three months later, on May 2, 2003, Evans issued Derosena a Corrective Action Form for negligent work practices and placed Derosena on a "30-day corrective action period."  (Pl. 56.1 Resp. ¶ 21; Def.. 56.1 Resp. ¶¶ 79, 81.)  The purpose of a Corrective Action Form is to show that the employee receiving the corrective action has reviewed and discussed the issues at hand with the supervisor.  (Def. 56.1 Resp. ¶ 81.)  In this case, the form served as a written warning and documented discussions between Derosena and Evans in April regarding negligent work practices.  (Pl. 56.1 Resp. ¶ 21; Def.. 56.1 Resp. ¶ 79; Def. Ex. A, Evans Dep. Ex. 9, Corrective Action Form.)  As noted in the form, Evans' reasons for placing Derosena on a corrective action period were two-fold: (1) Derosena failed to request certain refund checks and mail them to employers after Evans assigned this task to her[3] and (2) Derosena failed to mail a refund check to a participant in a Personal Investment Plan.  (Pl. 56.1 Resp. ¶ 21; Pl. Ex. 5, Derosena Dep. at 31-32, 196-97.)

With respect to the former reason,  Derosena admitted that the checks she failed to print and mail were on hold for a longer than acceptable period of time.[4]  (Pl. 56.1 Resp. ¶ 62; Pl. Ex. 5,

_____

[3]  Derosena disputes this "in part."  (Pl. 56.1 Resp. ¶ 62.)  According to Derosena, she inherited the checks on hold from other PAST team members.  (Id.; Pl. Ex. 5, Derosena Dep. at 31-32.)  After reassigned the task to her, Evans instructed Derosena to have the requests sent to another department, take the checks off hold, write the required letter, and send it out.  (Pl. 56.1 Resp. ¶ 62; Pl. Ex. 5, Derosena Dep. at 31-32.)  Approximately two to three months later, Evans issued Derosena a written warning because she had transactions on hold.  (Pl. Ex. 5, Derosena Dep. at 31-32.)  Derosena's response does not properly support a denial of the fact that Evan wrote up Derosena for not printing and mailing checks.  Thus, the Court deems paragraph 62 admitted.

[4]  During her deposition, Derosena initially speculated that this incident occurred in 2004.  (Pl. Ex. 5, Derosena Dep. at 31-32.)  Subsequently, when shown the May 2, 2003 written warning, Derosena clarified that she discussed the incident at issue with Evans during their April 2008 conversations regarding negligent work practices.  (Pl. Ex. 5, Derosena Dep. at 196-97.)  Thus, consistent with Derosena's testimony, the Court will assume that this occurred in 2003 rather than 2004.

Derosena Dep. at 40-41.) It was not an uncommon occurrence for someone in Derosena's position to have on hold a check that would later be released and mailed out to the appropriate party. (Def. 56.1 Resp. ¶ 75; Pl. Ex. 14, Evans Dep. at 32-33.) Similarly, Derosena was not the only PAST team member that had, at some point, failed to notify someone from the check generating team that a check was on hold. (Def. 56.1 Resp. ¶ 76.) According to Derosena, Evans did not write up co-workers James Yelton ("Yelton") (Black, male), Gregory Jackson ("Jackson") (Black, male), Heather Kuchari ("Kuchari") (non-Haitian, female), and Matthew Gallardo ("Gallardo") (Hispanic, male), despite the fact that they had, at some point, left checks on hold for an unacceptable period of time. (Pl. 56.1 Resp. ¶ 62.) Generally, whether a PAST team member was disciplined for having checks on hold was dependant upon a number of factors, including how many times the employee had left checks on hold for an impermissible amount of time. (Pl. 56.1 Resp. ¶ 61; Def. Ex. A, Evans Dep. at 36.)

Derosena's thirty-day corrective action period ended on June 17, 2003. (Pl. 56.1 Resp. ¶ 22.) At that time, Evans noted that Derosena's work during had improved during the period and cautioned Derosena that future incidents in work performance would result in disciplinary action, including termination. (*Id.*; Def. Ex. C, Derosena Dep. Ex. 7, Corrective Action Follow-up Meeting Form.) Despite this warning, the negative assessments continued in the latter half of 2003. On Derosena's July 28, 2003 mid-year review, Evans noted that Derosena: (1) seemed to struggle with her work flow and (2) had difficulty with complex work. Additionally, Evans observed that Derosena earned low scores on certain billing and account assessments that were administered to PAST team members on July 16, 2003 and instructed Derosena to retake the assessments no later than September 30, 2003. (Pl. 56.1 Resp. ¶ 23.)

Subsequently, at Derosena's December 2003 year-end performance review, Evans noted many of the same concerns. For instance, Evans observed that Derosena: (1) submitted a greater than acceptable amount of work that contained errors; (2) did not always appear to show a genuine desire to go beyond the minimum requirements; (3) did not indicate that she would have liked to take on more work, even though over 99% of her work was completed on time; (4) processed a lower quantity of work as compared to others; (5) had not successfully passed all her September 2003 assessments; and (6) needed to show consistency in her improvements. (Pl. 56.1 Resp. ¶ 24; Def. Ex. C, Derosena Dep. Ex. 9, 2003 Performance Effectiveness Form.)

Three months later, on March 17, 2004, Evans issued Derosena a second Corrective Action Form for exceeding the Board's four-hour restriction on personal telephone use. (Pl. 56.1 Resp. ¶¶ 25-26; Def. 56.1 Resp. ¶ 80.) According to the Corrective Action Form, which served as a written warning to Derosena, Derosena used nearly six and one-half hours of personal phone time in January 2004 and over four and one-half hours of phone time in February 2004. (Pl. 56.1 Resp. ¶¶ 26, 36; Def. 56.1 Resp. ¶¶ 80, 81.) In the warning, Evans cautioned Derosena that future excessive personal telephone use could result in disciplinary action, including termination. (Pl. 56.1 Resp. ¶ 26.) Evans also disciplined other PAST teams members for exceeding the four-hour limitation. (*Id.*)

In November 2004, the Board altered their policy regarding personal phone usage. (Pl. 56.1 Resp. ¶ 25.) Under the new policy, employees were discouraged from making personal calls during working hours, except in emergency situation. (*Id.*; Def. Ex. C, Derosena Dep. Ex. 11, Customer Service Department Performance Standards at 3.) While the new policy did not contain a four hour restriction on personal telephone calls, Board employees were warned that an abuse of personal calls

would result in disciplinary action. (Pl. 56.1 Resp. ¶ 25; Def. Ex. C, Derosena Dep. Ex. 11, Customer Service Department Performance Standards at 3.)

In December 2004, Evans completed Derosena's year-end performance review. (Pl. 56.1 Resp. ¶ 26; Def. Ex. C, Derosena Dep. Ex. 12, 2004 Personal Effectiveness Form.) In the review, Evans noted that Derosena had not met all her performance goals. (Pl. 56.1 Resp. ¶¶ 27-28.) With respect to the assessments, Evans observed that Derosena: (1) failed to achieve the required test score of 90% on two of the five assessments, despite her four attempts to do so between 2003 and 2004 and (2) had yet to pass three of the six mini-assessments, despite her two prior attempts. (Pl. 56.1 Resp. ¶ 27.) Evans also concluded that Derosena needed to manage her workload and priorities and improve her communication skills. (*Id.*)

In addition to this negative performance review, on December 9, 2004, Evans placed Derosena on a sixty-day probation (the "December 2004 probation") and issued Derosena a final written warning, which informed her that she had to improve her job performance. (Pl. 56.1 Resp. ¶ 29.) Evans' decision to place Derosena on probation stemmed from the following observations: (1) Derosena continued to make errors at work, despite her receipt of a written warning on May 2, 2003 for negligent work practices; (2) Derosena continued to use excessive amounts of time for personal telephone calls, despite receipt of a written warning on March 17, 2004 for excessive personal telephone use; (3) Derosena failed to pass all of the required assessments; and (4) Derosena failed to meet her 2004 performance goal of improving her communications skills by preparing letters that did not require extensive editing. (*Id.*) Defendants had previously provided Derosena with written notice regarding the conduct identified in the warning. (Def. 56.1 Resp. ¶ 71.)

Derosena testified that she believes she was put on probation because she did not complete a performance improvement goal related to writing business letters and did not finish her work in a timely fashion. (Pl. 56.1 Resp. ¶ 69.) According to Derosena, Evans failed to place co-worker Matt Gallardo on probation, despite the fact that he had failed to start working on a similar project related to the business letter writing goal. (*Id.*; Pl. Ex. 5, Derosena Dep. at 107.) At the time of Derosena's probation, Gallardo, who had several years less experience as a PAST team member than Derosena, had passed more plan assessments than Derosena and had not received any warnings for negligent work practices or excessive personal telephone use. (Pl. 56.1 Resp. ¶¶ 63-64.) Derosena did not submit a rebuttal to the Board regarding the December 9, 2004 incident. (Def. 56.1 Resp. ¶ 102.) Instead, on January 13, 2005, Derosena filed her first charge of discrimination (the "January 2005 charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging that Derosena's team leader discriminated against her on account of her sex and national origin. (*Id.*; Pl. 56.1 Resp. ¶ 8.)

Generally, an employee placed on probation received a final warning regarding his performance as well as an explanation of what he needed to do to correct the problem. (Pl. 56.1 Resp. ¶ 30.) When the employee successfully completed his probation, he returned to "business as usual." (Def. 56.1 Resp. ¶ 90; Pl. Ex. 18, Brothers Dep. at 45-46.) If, however, the employee's job performance did not improve within the allotted time period, the failure could lead to dismissal. (Pl. 56.1 Resp. ¶ 30.)

On February 9, 2005, Evans released Derosena from probation. (Pl. 56.1 Resp. ¶ 31.) At that time, Derosena had yet to achieve the required score of 90% or higher on one of her assessments. (*Id.*) Shortly after the release, Evans completed an evaluation of Evan's work

performance during the probationary period. (Def. 56.1 Resp. ¶ 83.) In the evaluation, Evans noted that Derosena: (1) limited her monthly personal phone use to well under the one-hour time limit established for the probationary period; (2) came prepared to each meeting with her work items report and did a "great job" ensuring that she was current with her work items; (3) made a considerable effort to ensure she met the expectations of her position; and (4) consistently turn in her daily timelines. (*Id.*)

Shortly thereafter, Evans again evaluated Derosena's work performance during the mid-2005 performance evaluation. (Pl 56.1 Resp. ¶ 32; Def. Ex. C, Derosena Dep. Ex. 15, 2005 Performance Evaluation.) At that time, Evans noted, among other things, that Derosena: (1) needed to analyze information and make decisions before requesting the assistance of others and (2) still appeared to struggle with managing time and prioritizing work.[5] (Pl. 56.1 Resp. ¶ 32.)

In May 2005, Darcel Brothers ("Brothers"), a non-Haitian female, assumed the role of Derosena's immediate supervisor. (Pl. 56.1 Resp. ¶ 6.) Derosena admits that Brothers did not treat Derosena worse than she treated other employees on account of Derosena's national origin or gender. (Pl. 56.1 Resp. ¶ 34; Def. Ex. B, Derosena Dep. at 242, 247.)

Subsequently, in February 2006, Brothers gave Derosena her 2005 year-end performance evaluation. (Pl. 56.1 Resp. ¶ 35; Def. 56.1 Resp. ¶ 85.) At that time, Brothers also identified several

---

[5] Local Rule 56.1 allows a party opposing summary judgment to file a statement of undisputed material facts consisting of "short numbered paragraphs." Ignoring this obligation, Derosena filed a statement of fact that exceeds one page regarding comments made in her 2005 performance evaluations. Such a paragraph cannot be characterized as "short." Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. *Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1) The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)). Because the Court will not tolerate such egregious non-compliance with Local Rule 56.1, the Court strikes paragraph 84 of Derosena's statement of additional facts.

issues with respect to Derosena's work performance, including that Derosena: (1) had not fully met all of her year-end goals; (2) had not fulfilled her "past due work" action item; (3) needed to take account for the work and due dates and prioritize her daily workload; (4) did not quality check or take a team member's transactions off hold on several occasions as a result of her negligence; (5) needed to focus on her decision-making skills; and (6) became careless when logging out work. (Pl. 56.1 Resp. ¶ 35; Def. 56.1 Resp. ¶ 85.)   Derosena did not submit any comments to the Board regarding this evaluation. (Pl. 56.1 Resp. ¶ 35.)

On June 9, 2006, the EEOC issued Derosena a Notice of Right to Sue letter regarding the January 2005 charge. (Def. 56.1 Resp. ¶ 8; Pl. 56.1 Resp. ¶ 86; Pl. Ex. 8, Dismissal and Notice of Rights, 1/9/05.)

Derosena continued to make errors in 2006. (Pl. 56.1 Resp. ¶ 37.)   Specifically, Derosena took a number of incorrect actions that resulted in account transaction and processing errors in January, February, May, and June 2006.[6]   (*Id*.)   On July 31, 2006, as a result of these recurring errors, Brothers issued Derosena a "final written warning" regarding her performance and placed Derosena on a 45-day probation with a work improvement plan ("July 2006 probation"). (*Id.*; Def. 56.1 Resp. ¶ 89.) The Corrective Action Form that memorialized the written warning and July 2006 probation does not refer to any other Corrective Action Forms. (Def. 56.1 Resp. ¶ 87. ) The form does, however, list and describe the January, February, May, and June 2006 incidents that resulted in Brothers' issuance of the probation as well as certain alleged communications sent to and had with Derosena regarding the same. (Pl. 56.1 Resp. ¶ 37; Def. Ex. C, Derosena Dep. Ex. 16,

---

[6] As noted below, Derosena denies receipt of written warnings related to these incidents. She does not, however, deny that the identified errors occurred, nor that she was responsible for the errors. (Pl. 56.1 Resp. ¶ 37; Def. 56.1 Resp. ¶ 87.)

Corrective Action Form.)  Although Derosena testified that, prior to the July 2006 probation, she did not receive any complaints from Brothers or others regarding her work performance in 2006, she also admits that she received communications in February 2006 informing her of a processing error. (Def. 56.1 Resp. ¶ 87; Pl. Ex. 5, Derosena Dep. at 264-65.)  In addition, Derosena could not recall whether she had received communications regarding the May 2006 incident.  (Def. 56.1 Resp. ¶ 87; Pl. Ex. 5, Derosena Dep. at 265-66.)

When placed on probation in July, Brothers cautioned Derosena that she had to improve her job performance immediately, could not make any additional similar errors, and had to perform her job in compliance with certain action plans and all other policies, procedures, and rules.  (Pl. 56.1 Resp. ¶ 37.)  Brothers also warned Derosena that further unsatisfactory work performance during the probationary period could result in disciplinary action, including termination.  (*Id.*.)  Finally, Brothers informed Derosena that her performance would be evaluated at the end of the probationary period, at which time a decision would be made regarding Derosena's continued employment.  (*Id.*)  When issued, the July 31, 2006 Corrective Action Form was intended to be Derosena's final warning regarding her poor job performance.  (Def. 56.1 Resp. ¶ 89.)

The next month, Brothers conducted Derosena's mid-2006 performance evaluation.  (Pl. 56.1 Resp. ¶ 38.)  In the evaluation, Brothers observed that Derosena: (1) had processing accuracy statistics were below the overall standard; (2) made many mistakes that could have been prevented; (3) was not effectively managing her daily work; and (4) had too many past due work items.  (Pl. 56.1 Resp. ¶ 38.)  In addition, Brothers noted that Derosena needed to: (1) work on her ability to proof her own work before giving it to a peer reviewer; (2) work on getting all of her assigned work processed on or before the duty date; and (3) improve her accuracy statistics by concentrating on

what she was doing. (*Id.*.) Finally, Brothers stated that Derosena would not be able to work on any extra assignments until she became up to date on her daily assignments. (Pl. 56.1 Resp. ¶ 38.)

On September 11, 2006, Derosena initiated the current action by filing a complaint against the Board, Reid, Evans, and Gertrude Livernois ("Livernois") alleging employment discrimination. (Def. 56.1 Resp. ¶ 96; Pl. Ex. 24, Complaint, 9/11/06.)

According to the July 2006 Corrective Action Form, unless otherwise notified, Derosena's 45-day probationary period would elapse on September 14, 2006. (Def. 56.1 Resp. ¶ 92.) Although Derosena had been given a probation release form at the end of her February 2005 probationary period, Brothers never gave Derosena a release for her July 2006 probation. (Def. 56.1 Resp. ¶¶ 88, 92.)

Unbeknownst to Derosena, in October 2006, Brothers concluded that Derosena should be discharged because her job performance had not improved. (Pl. 56.1 Resp. ¶ 39; Def. Ex. D, Brothers Dep. at 19.) In accordance with the Board's procedures, Brothers discussed his conclusion regarding discharging Derosena with Senior Human Resources Generalist, Patricia Trotter ("Trotter") and Managing Director of Customer Services, Debbie Reid ("Reid"). (Pl. 56.1 Resp. ¶¶ 3, 7, 39.) Trotter and Reid did not agree with Brothers' conclusion; instead, they recommended that Brothers extend Derosena's probation for an additional 45 days. (Pl. 56.1 Resp. ¶ 39.) According to Brothers, the purpose of the extended probation was to allow Derosena to demonstrate an improvement in her job performance. (Def. 56.1 Resp. ¶ 89; Pl. Ex. 18, Brothers Dep. at 69-70.) Subsequent to this discussion, Trotter and Reid informed Brothers that they also recommended an extended probation rather than termination because of the extenuating circumstances between

Derosena and Evans with regard to the discrimination charge.[7]  (Def. 56.1 Resp. ¶ 91; Pl. Ex. 18, Brothers Dep. at 24-29.)

Brothers followed this recommendation and, on October 27, 2006, extended Derosena's probation for an additional 45 days, until December 11, 2006 ("October 2006 probation").  (Pl. 56.1 Resp. ¶ 39; Def. 56.1 Resp. ¶¶ 88, 92.)  Derosena did not tell anyone at the Board that she believed Brothers extended her probation in retaliation for filing a discrimination charge.  (Pl. 56.1 Resp. ¶ 40.)  She did, however, file a second charge of discrimination with EEOC on November 2, 2006, alleging retaliation (the "November 2006 charge").  (Def. 56.1 Resp. ¶ 9; Def. Ex. G, Charge of Discrimination, 11/2/06.)

On December 6, 2006, a processing error was committed in the amount of approximately $518,000 (the "$518,000 error").  (Pl. 56.1 Resp. ¶ 41; Def. Ex. D, Brothers Dep. at 70; Def. Ex. C, Derosena Dep. Ex. 18, Termination Memo.)  The parties dispute whether Derosena committed the error.  (Pl. 56.1 Resp. ¶ 41; Def. 56.1 Resp. ¶ 94.)  According to Brothers', Derosena committed the $518,00 error.  (Def. Ex. D, Brothers Dep. at 32, 69-70.)  According to Derosena, someone other than she caused the error, but Brothers thought Derosena was responsible because Derosena's electronic initials were the last initials left on the account.  (Def. 56.1 Resp. ¶ 94; Pl. Ex. 5, Derosena Dep. at 285-86.)

---

[7] Defendants submit that "Brothers did not learn of Derosena's claims of discrimination until after she decided in October 2006 that Derosena should be discharged."  (Pl. 56.1 Resp. ¶ 39.)   In support of this statement of fact, Defendants cite to Brother's testimony regarding an October 2006 meeting with Reid and Trotter in which Reid and Trotter informed Brothers of Derosena's claims of discrimination.  (*Id.*; Def. Ex. D, Brothers Dep. at 17-23, 26-29, 30-33, 52, 62.)  Because this testimony does not support the assertion that Brothers *first* gained knowledge of the discrimination claims during this October 2006 meeting, the Court will not consider this statement of fact for the purposes of summary judgement.  *See* L.R. 56.1.

According to Brothers, Derosena's job performance worsened after her probation was extended. (Def. 56.1 Resp. ¶ 41; Def. Ex. D, Brothers Dep. at 69-70.) As a result of Derosena's inability to correct her performance problems and the $518,000 processing error, Brothers wrote a memorandum to Trotter recommending that Derosena be discharged immediately ("the Termination Memorandum"). (Pl. 56.1 Resp. ¶ 41.) In the Termination Memorandum, Brothers noted that Derosena: (1) was placed on a final Performance Improvement Counseling ("PIC"), but did not fully meet the specific measurable expectation requirements or department standards during that time; (2) was placed on an extended probation as a result of her failure to satisfy the PIC requirements; and (3) exhibited a decline in job performance during the extended probation period, which included a failure to meet job expectations as well as the probation goals for accuracy, completion of work, and on-time percentage. (*Id.*; Def. Ex. C, Derosena Dep. Ex. 18, Termination Memo at 1.) Brothers also noted that Derosena processed a complete account transfer that was in error in the amount of approximately $518,000 and did not respond to Brothers' subsequent requests for documentation related to the cause and resolution of the error. (Pl. 56.1 Resp. ¶ 41; Def. Ex. C, Derosena Dep. Ex. 18, Termination Memo at 1.)

Brothers' recommendation was approved and, on December 18, 2006, Derosena was terminated. (Pl. 56.1 Resp. ¶ 42.) At that time, Derosena was the second most senior member of the PAST team. (Pl. 56.1 Resp. ¶ 45.) Evans was not consulted with respect to Brothers' recommendation for discharge. (Pl. 56.1 Resp. ¶ 43.) Two days later, on December 20, 2006, Derosena filed a third charge of discrimination with the EEOC, alleging retaliation. (Def. 56.1 Resp. ¶ 10; Pl. Ex. 4, Charge of Discrimination, 12/20/06.) Subsequently, on February 15, 2007, Board employee Cheryl Graham ("Graham") assumed Derosena's position. (Pl. 56.1 Resp. ¶ 46.)

<u>Derosena's Internal Complaints</u>

Between 2004 and 2005, Derosena discussed her issues regarding Evans with three Board employees: Trotter, Allan Javier ("Javier"), and Shevelle Woodcox ("Woodcox"). (Pl. 56.1 Resp. ¶ 47.) Derosena did not approach any other Board supervisors or Human Resources personnel to complain about the alleged discrimination or retaliation. (Pl. 56.1 Resp. ¶ 51.)

Derosena spoke with Trotter at some point after Evans placed Derosena on probation in December 2004. (Pl. 56.1 Resp. ¶ 49; Def. Ex. C, Derosena Dep. Ex. 8, Employee Comments.) During the conversation, Derosena expressed to Trotter her concerns that Evans scrutinized Derosena's work, treated Derosena differently because of her national origin, and treated males better than she treated females. (Pl. 56.1 Resp. ¶ 49; Pl. Ex. 5, Derosena Dep. at 56.) Trotter explained to Derosena that she was not being targeted and that other employees has also been placed on probation. (Pl. 56.1 Resp. ¶ 49.) After the conversation, Derosena felt as though Trotter was siding with Evans and could no longer be of assistance to her. Derosena did not complain to Trotter about Evans subsequent to this meeting. (*Id.*; Def. 56.1 Resp. ¶ 99.)

Derosena also discussed Evans with Javier, a co-worker in the human resources department. (Pl. 56.1 Resp. ¶¶ 46-47; Pl. Ex. 5, Derosena Dep. at 52.) Specifically, Derosena told Javier that she had to find a way to deal with her relationship with Evans, that she believed Evans singled Derosena out because of her national origin, and that Evans treated females more harshly than she treated males. (Pl. 56.1 Resp. ¶ 48; Def. 56.1 Resp. ¶ 100.) Javier suggested that Derosena approach Evans and tell Evans that she was interested in improving their relationship. (Pl. 56.1 Resp. ¶ 48; Def. Ex. C, Derosena Dep. Ex. 8, Employee Comments.)

In 2004 or 2005, Derosena also told Woodcox that she was stressed because of her relationship with Evans and that Evans treated male subordinates more favorably than female subordinates. (Pl. 56.1 Resp. ¶ 50.) In response, Woodcox counseled Derosena to work on her relationship with Evans. (*Id.*) Derosena did not complain to Woodcox subsequent to this conversation. (*Id.*)

Derosena never complained to anyone at the Board about Livernois (Managing Director of Human Resources) or Reid and admits that Livernois and Reid never harassed, discriminated against, or retaliated against Derosena in any way. (Pl. 56.1 Resp. ¶¶ 4, 11.)

Discipline of Other PAST Team Members

Derosena admits that Evans is the only Board supervisor that she believes harassed and treated her differently than non-Haitian employees and male employees. (Def. 56.1 Resp. ¶ 12.) At some point during Evans' tenure as Derosena's supervisor, Derosena deleted certain folders from a system computer file. (Pl. 56.1 Resp. ¶ 67; Def. Ex. B, Derosena Dep. at 33.) Upon discovering this information, Evans confronted Derosena and threatened to, but did not, write her up if she deleted another folder from the system computer file. (Pl. 56.1 Resp. ¶ 67.) Shortly thereafter, other PAST team members deleted additional folders from the computer file. (*Id.*) As a result, Evans addressed the issue with the team as a whole. (*Id.*) While Derosena testified that no one else was threatened with a write-up, she admits that she does not know whether Evans threatened anyone else with discipline for deleting items.[8] (*Id.*; Def. Ex. B, Derosena Dep. at 51.)

---

[8] As noted above, Local Rule 56.1 allows a movant to file a statement of undisputed material facts consisting of "short numbered paragraphs." Paragraph 53 of Defendants' Statement of Material Facts In Support of Their Motion for Summary Judgment includes a series of statements regarding Derosena's complaints that exceeds one page. As noted above, the Court will not ignore such egregious non-compliance with the local rules As such, the Court strikes paragraph 53 and will not consider the statements contained therein. *See Ammons.*, 368 F.3d at 817.

Only one PAST team member, Steven Green ("Green"), was discharged during Evans' tenure as the PAST team supervisor. (Pl. 56.1 Resp. ¶ 55.) Green, a non-Haitian male, was discharged on January 30, 2002 as a result of his excessive absenteeism.[9] (*Id.*; Def. Ex. F, D422-23, Green Termination Memo.)

During Brothers' tenure as Derosena's supervisor, three other PAST team members were discharged: Maria Macaspac-Higgins ("Macaspac-Higgins"), Jennifer Williams ("Williams"), and Aisha Marshall ("Marshall"). (Pl. 56.1 Resp. ¶ 56.) All three women are non-Haitian. (*Id.*) On April 7, 2006, Macaspac-Higgins was discharged because of her failure to participate in required training exercises as well as her inability to work the required hours of her job. (*Id.*) Williams was discharged on August 3, 2006 for failing to properly process checks made payable to the Board and failing to mail out refund checks. (Pl. 56.1 Resp. ¶ 58.) Finally, on September 19, 2006, Marshall was discharged for excessive absences and excessive personal telephone use. (Pl. 56.1 Resp. ¶ 59; Def. Ex. F, D264-65, Marshall Termination Memo.)

<u>National Origin Related Comments</u>

Derosena's colleagues made two comments that made her feel uncomfortable. (Def. 56.1 Resp. ¶ 101.) First, co-worker Robert Matskiel ("Matskiel") jokingly characterized Haiti as a third world country. (*Id.*) Second, Evans and Lois Long, a Plan Sponsor Manager, asked Derosena a question regarding whether Caribbean women disliked American women. (*Id.*; Pl. Ex. 5, Derosena Deposition at 22-25.) Derosena never heard anyone at the Board speak in derogatory terms with respect to Haitian people specifically, nor did anyone tell Derosena that they heard a Board

---

[9] Derosena disputes this statement "as to the scope of [Green's] misconduct," but does not support her disagreement with any further explanation or specific reference to the record, as required by Local Rule 56.1. *See* L.R. 56.1(b)(3)(B). Thus, the Court deems this fact, as well as any other fact based on a similar objection, admitted.

employee speak in such a manner.  (Pl. 56.1 Resp. ¶ 13.)  Additionally, Derosena never heard

anyone at the Board make a derogatory comment regarding Derosena on account of her gender.  (*Id.*)

No Board employee (including Evans, who became aware of the charge while Derosena was

employed), ever made a comment to Derosena regarding her filing a discrimination charge with the

EEOC or initiating the current lawsuit.  (Pl. 56.1 Resp. ¶¶ 14, 33.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence

and draw all reasonable inferences in favor of the party opposing the motion.  *Bennington v.*

*Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment

to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement."

*Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a

proposed statement of fact is supported by the record and not adequately rebutted, the court will

accept that statement as true for purposes of summary judgment.  An adequate rebuttal requires a

citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v.*

*City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134

F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion

of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete

facts establishing the existence of the truth of the matter asserted.'").

**DISCUSSION**

I.    Discrimination (Counts I - III)

Because the same methods of proof and standards apply to discrimination claims brought pursuant to Title VII and § 1981, the following discussion applies with equal force to Counts I through III. *See Sublett v. John Wiley & Sons,* 463 F.3d 731, 736 (7th Cir. 2006) (*quoting Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996)) ("[A]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical.") (internal quotations omitted).

A plaintiff may prove employment discrimination under Title VII and § 1981 if she either: (1) presents sufficient evidence of discriminatory motivation to create a triable issue of fact (the "direct method") or (2) establishes a *prima facie* case of discrimination under the "burden shifting" method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), (the "indirect method"). *Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007); *Sublett,* 463 F.3d 736-37. Derosena proceeds under the latter burden-shifting method.[10]

To establish a *prima facie* case of discrimination under the indirect method of proof, plaintiff must show that: (1) she is a member of a protected class; (2) she was meeting the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated employees outside of the protected class more favorably. *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003). If the plaintiff makes out the *prima facie* case, the

---

[10] In their summary judgment briefs, Defendants challenged the viability Derosena's discrimination claims under both methods of proof. Derosena fails to address or even acknowledge Defendants' direct method argument. Consequently, the Court will consider this argument waived and focus solely on the indirect method. *See Culver v. Gorman & Co.*, 416 F.3d 540, 550 (7th Cir. 2005) ("In . . . [the Seventh Circuit], unsupported and undeveloped arguments are waived.'") (*quoting United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005).

burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *Id.* Once such a reason is given, the burden then returns to the plaintiff to show that the employer's explanation was pretextual. *Id.*

Defendants do not challenge Derosena's ability to establish the first and third elements of the *prima facie* case. With respect to the first element, it is undisputed that Derosena is a Haitian female. (Pl. 56.1 Resp. ¶ 1.) With respect to the third element, Derosena identifies the following "adverse actions" in her response brief: (1) Defendants scrutinized Derosena more closely than non-Haitian employees or male employees; (2) Defendants placed Derosena on probation on December 9, 2004; and (3) Derosena participated in a review process associated with the probation and was released from probation on February 9, 2005.[11] (Pl. Resp. 8.) Instead, Defendants contend that Derosena's discrimination claims fail under the indirect method because she cannot establish that she was meeting Defendants' legitimate expectations or that Defendants treated similarly situated employees outside the protected class more favorably. Because it is dispositive, the Court will address the latter similarly situated prong first. For the reasons set forth below, the Court concludes that Derosena cannot establish a *prima facie* case of national origin or gender discrimination. Thus, Defendants' motion for summary judgment is granted as Derosena's discrimination claims in Counts I through III.

---

[11] While the Court questions whether several of these alleged actions constitute "adverse employment actions" based on the record presented, the Court will not rely on this ground as a basis for its decision. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 735-36 (7th Cir. 2006) (*citing Edwards v. Honeywell*, 960 F.2d 673, 674 (7th Cir. 1992)) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision.").

*A. Similarly Situated Requirement*

To be similarly situated, another employee must be "'directly comparable in all material respects.'" *Sublett,* 463 F.3d at 740 (*quoting Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004)). In determining whether employees are similarly situated, the plaintiff must show that he or she is similarly situated with respect to performance, qualifications, and conduct. *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005). This normally includes a showing that the employee "'dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Gates v. Caterpillar*, 513 F.3d 680, 690 (7th Cir. 2008). The purpose of the requirement is to "determine whether there are enough common factors between a plaintiff and a comparator–and few enough confounding ones–to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lily & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) (*citing Humphries v. CBOCS West, Inc.*, 474 F.3d 397, 406 (7th Cir. 2007)). Ultimately, the employee must show *substantial similarity*, rather than complete identity, when comparing himself to the favorably treated employee. *Humphries v. CBOCS West, Inc.*, 474 F.3d 397, 405 (7th Cir. 2007). Thus, the inquiry asks whether there are sufficient commonalities between the would be "comparator" and the plaintiff to allow the type of comparison that would allow the jury to reach an inference of discrimination. *Humphries*, 474 F.3d at 405. Drawing all reasonable inferences in favor of Derosena, the Court concludes that Derosena has failed to sustain her burden at the summary judgment stage.

Derosena's discussion regarding this element, which rests on speculation and generalizations, is wholly deficient. For example, in support of her comparator argument, Derosena submits that:

(1) "the Board had a history of not disciplining male employees for similar misconduct as severely as they disciplined Derosena"; (2) "it seemed to her" that her work was scrutinized at a higher level than other non-Haitian or male employees and (3) "she felt" that Evans preferred men in Derosena's group, granting them favors and not scrutinizing that as much.[12] (Pl. Resp. 8.)  As noted above, the plaintiff is required to  show that the comparator is "'directly comparable in all material respects.'" *Sublett,* 463 F.3d at 740.  Such self-serving, conclusory, and speculative statements are insufficient to meet Derosena's burden at summary judgment.  *See Oest v. Ill. Dept. of Corrections*, 240 F.3d 605, 615 (7th Cir. 2001) ("conclusory assertion[s]" that plaintiff was treated differently, without specific evidence, will not satisfy the similarly situated requirement); *see also Haywood v. N. Am. Van Lines*, 121 F.3d 1066, 1071 (7th Cir. 1997) ("Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment"); *Campbell v. Dominick's Finer Foods*, *Inc.*, 85 F. Supp. 2d 866, 873 (N.D. Ill. 2000) ("Absent evidence that these unidentified persons were similarly situated and engaged in materially similar misconduct, [plaintiff] cannot survive summary judgment on this point.").

Nor do the facts presented support Derosena's contention that Defendants treated similarly situated non-Haitian and male employees more favorably.  According to Derosena, the following incidents illustrate how Defendants treated Derosena differently:  (1) Derosena received lower performance evaluations than Gallardo because she is female and Haitian; (2) Gallardo was written up, rather than terminated, for making mistakes; (3) Kucharik was orally reprimanded, rather than terminated, for making mistakes; (4) Evans threatened to write up Derosena after she deleted certain

_____

[12] In addition, Derosena presents several arguments and allegations that speak to the pretext analysis rather than the similarly situated analysis.   Such arguments are irrelevant to the *prima facie* analysis; a "plaintiff must meet each prong of the prima facie test before reaching pretext."  *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004).

folders from a system computer file, but did not threaten others when additional folders were deleted.; (4) Evans did not issue written warnings to Kucharik, Gallardo, Yelton, and Jackson, despite the fact that they previously had checks on hold; and (5) Evans did not put Gallardo on probation in December 2004, despite the fact that he had not completed his letter writing assignment. With respect to the former four bases of comparison, the record is devoid of any evidence – aside from Derosena's conclusory assertions – from which one could reasonably infer that the named employees were "directly comparable in all material respects." As such, the former four bases cannot support a *prima facie* case for retaliation under the indirect method.

Nor has Derosena presented any evidence regarding the latter two bases of comparison to create a triable issue. With respect to the fourth bases of comparison, Derosena asserts that Evans did not issue written warning to team members Yelton, Jackson, Kuchari, and Gallardo, despite the fact that they had left checks on hold for a longer than acceptable period of time. The record is devoid of any details such that one could reasonably infer that Yelton, Jackson, Kuchari, or Gallardo are comparable in "all material respects." *Sublett,* 463 F.3d at 740. Whether a supervisor disciplined a PAST team member for leaving checks on hold was dependant upon a number of factors, including how many times the employee had left checks on hold for an impermissible amount of time. (Def. 56.1 Resp. ¶ 76; Pl. 56.1 Resp. ¶ 61; Def. Ex. A, Evans Dep. at 36.) While Evans disciplined Derosena for leaving checks on hold on two occasions, in both instances this infraction was just one of multiple reasons for the discipline. As noted above, Derosena must show, among other things, that the purported comparator "'had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Gates*, 513 F.3d at 690. In this case, however, there is no specific testimony

regarding the positions of these individuals, how long they had left the checks on hold, how many times they had left checks on hold, when they left checks on hold, whether they had committed other violations at the time, whether they were subject to the same standards, the nature of their duties, their disciplinary histories, or even when and if Evans knew that the these employees had left checks on hold for an unacceptable period of time. Absent such a showing, Derosena's vague assertions regarding Yelton, Jackson, Kuchari, or Gallardo cannot support a retaliation claim.

Derosena's final bases of comparison suffers from the same infirmities. Derosena submits that Evans disciplined Derosena for not completing a performance improvement goal related to letter writing, but not male non-Haitian team member Gallardo. (Pl. 56.1 Resp. ¶ 56.) Derosena's conduct, however, went beyond a mere failure to meet a performance improvement goal. In addition to her failure to meet her 2004 performance goal of improving her communication skills, Evans put Derosena on probation as a result of her continuous errors, continued use of excessive personal telephone calls, and failure to pass all of her required assessments. (Pl. 56.1 Resp. ¶ 29.) Again, Derosena has failed to present any evidence from which one could reasonably infer that Gallardo was "similarly situated." Significantly, Derosena does not present evidence of a combination of improper conduct. To the contrary, the evidence presented indicates that, in December 2004, Gallardo had passed more plan assessments than Derosena and had not previously received any warnings for negligent work practices or excessive telephone use. (Pl. 56.1 Resp. ¶¶ 63-64.) Given the circumstances presented, the Court concludes that Derosena has failed to establish the existence of a sufficient comparator with respect to her December 2004 probation. *See Gates*, 513 F.3d at 690-91 (vague assertions, without evidence of a combination of similar improper conduct between the plaintiff and purported comparators, is insufficient to establish a *prima facie* case).

23

For the reasons stated above, the Court concludes that Derosena has failed to raise a genuine issue of material fact regarding whether Defendants treated similarly situated males or non-Haitian employees more favorably. Because the failure to establish any one element of the *prima facie* case is fatal to an employees discrimination claim, the Court need not determine whether Derosena was performing according to the Board's legitimate job expectations. *See Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). Accordingly, the Court grants Defendants' motion for summary judgment as to the discrimination claims set forth in Counts I through III.

II.     Retaliation (Counts III - IV)

Derosena also contends that Defendants took a number of actions in retaliation after Derosena filed her January 25, 2005 EEOC charge in violation of § 1981 and Title VII. While the Court has previously concluded that Derosena cannot maintain a discrimination claim under Title VII or § 1981, Derosena may still raise a viable retaliation claim if she can demonstrate that Defendants retaliated against her for attempting to raise a good faith discrimination claim under Title VII or § 1981. *See Alexander v. Gerhardt Enters.*, 40 F.3d 187, 195 (7th Cir. 1994). Because the same methods of proof and standards apply to retaliation claims brought pursuant to Title VII and § 1981, the following discussion applies with equal force to Counts III and IV. *Humphries*, 474 F.3d at 403-04.

To overcome Defendants' motion for summary judgment and establish a *prima facie* case of retaliation, Derosena may proceed under either the direct method or indirect method of proof. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (*citing Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002)). In this case, Derosena attempts to proceed under both methods.

## A. Direct Method

To establish retaliation under the direct method of proof, the plaintiff must establish that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action subsequent to this protected activity; and (3) a causal connection between the two. *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (*citing Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)). In the absence of direct evidence (or, evidence that establishes the proposition without resort to inferences from circumstantial evidence), a plaintiff can succeed under the direct method by presenting sufficient circumstantial evidence such that a jury could infer retaliation. *Id.* Circumstantial evidence can include suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext and other evidence which allows the jury to reasonably infer retaliation. *See Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487, 491 (7th Cir. 2007) (*citing Yong-Qian Sun v. Bd. of Trs.,* 473 F.3d 799, 812 (7th Cir. 2007)).

In the present case, neither party disputes that Derosena engaged in a protected activity and suffered an adverse employment action. With respect to the former, Derosena filed a charge with the EEOC on January 13, 2005 and initiated the instant action on September 11, 2006.[13] With respect to the latter element of retaliation, Derosena was placed on probation on July 31, 2006, received an extended probation on October 27, 2006, and was terminated on December 16, 2006. The only remaining question is whether she can establish a causal link between the participation

---

[13] Derosena does not identify the initiation of the current suit as protected activity in her Complaint. Nevertheless, Defendants have not objected to or acknowledged Derosena's use of the lawsuit as a bases for her retaliation claims. Even with this added protected activity, Derosena's retaliation claims cannot survive summary judgment. Thus, the Court need not decide whether Derosena the September 2006 may serve as proper bases for her retaliation claim. In addition, the Court notes that, while the record indicates that Derosena filed a second EEOC charge on November 2, 2006, she fails to reference the charge in her Complaint as well as her summary judgment submissions. Thus, the Court deems this argument waived. *See Culver*, 416 F.3d at 550; *see also* ; *see also Graham v. AT&T Mobility, LLC*, Nos. 06-3020, 06-3734, 2007 U.S. App. LEXIS 21598, at *12 (7th Cir. Sept. 6, 2007).

in protected activity and the adverse employment actions. Derosena has proffered no direct evidence to establish this causal link. Instead, she relies on circumstantial evidence, primarily in the form of timing between her protected activities and the adverse employment actions taken by Defendants.

"'Suspicious timing alone is rarely sufficient to create a triable issue'" as to the requisite causal connection. *Kodl v. Bd. of Educ.*, 490 F.3d 558, 563 (7th Cir. 2007) (*quoting Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)); *see also Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). "The inference of causation weakens as the time between the protected expression and the adverse action increases." *Oest*, 240 F.3d at 616. In such circumstances, "'additional proof of a causal nexus is necessary.'" *Id.* (*quoting Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998)). As discussed in detail below, the instant action does not fall into the category of "rare" cases in which timing alone would satisfy the *prima facie* case, nor has Derosena proffered additional circumstantial evidence from which one could reasonably infer retaliation. For the sake of clarity, the Court will address each adverse action separately.

*i. July 31, 2006 Probation*

In support of her position, Derosena contends that the following evidence raises a triable issue as to causation: (1) the temporal separation between her June 9, 2006 receipt of a right to sue letter[14] and the July 2006 probation; (2) the temporal separation between her January 2005 charge and the July 2006 probation; and (3) Derosena's "clean slate" after she was released from probation in February 2005 combined with the absence of written warnings in 2006 prior to July 2006 probation..

_____

[14] While Derosena asserts that she "received" her right to sue letter on June 9, 2006, the record establishes only that the EEOC issued the right to sue letter on June 9. Nevertheless, because it will not affect the Court's conclusion, the Court will assume that Derosena received her right to sue letter on or shortly after June 9, 2006.

First, to the extent that Derosena attempts to argue that either the issuance or her receipt of the June 9 right to sue letter constituted a protected activity, this argument is without merit. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("[T]he suggestion that the EEOC's issuance of a right-to-sue letter--an action in which the employee takes no part--is a protected activity of the employee" is "utterly implausible.") (per curiam). Thus, no inference can be drawn from the temporal proximity between the date of the letter and the adverse actions. Furthermore, there is no evidence from which one could reasonably infer that Brothers, or the Board in general, knew of Derosena's receipt of a right to sue letter or the contents contained therein. Thus, the mere issuance of the June 9 right to sue letter is not circumstantial evidence of retaliation.

Also fatal to Derosena's claim is the complete absence of information from which a trier of fact could reasonably infer that Brother's was aware of the January 2005 EEOC charge when she placed Derosena on probation on July 31, 2006. Under the direct method, Derosena "must provide . . . evidence that the decisionmaker has acted for a prohibited reason." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003). A decisionmaker cannot retaliate against the employee if she is unaware of the complaints asserted against her. *Miller v. Am. Family Mut. Ins. Co*., 203 F.3d 997, 1008 (7th Cir. 2000). In this case, the evidence presented suggests that Brothers was solely responsible for the decision to place Derosena on probation. *See Rogers*, 320 F.3d at 754 (*quoting Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997)) ("A decisionmaker is the person 'responsible for the contested decision.'"). The "key inquiry," then, "is whether [Brothers] was aware of the allegations of discrimination at the time of her decision[] to place [Derosena] on [probation]." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004).

Derosena filed her first charge of discrimination over eighteen months before the July 2006 probation. The allegations contained within the charge were directed at Evans and Evans, rather than Brothers, was Derosena's immediate supervisor when Derosena filed the charge. Additionally, no Board employee ever discussed with or made a comment to Derosena regarding the January 2005 charge. In light of this undisputed evidence and the absence of any evidence indicating otherwise, a trier of could not reasonably infer that Brothers was aware of the January 2005 charge in July 2006. Without such knowledge, Derosena's decision to place Derosena on probation on July 31, 2006 could not have been retaliatory. *See Luckie*, 389 F.3d at 715 ("It is not sufficient that an employer could or even should have known about an employee's complaint; the employer must have had actual knowledge of the complaints for its decisions to be retaliatory.") (internal quotations and alterations omitted); *see also Huppert v. Potter*, 232 Fed. Appx. 576, 581 (7th Cir. 2007) (summary judgment denied where the plaintiff provided no evidence that decision makers were aware of the plaintiff's EEO complaint).

Moreover, even if the Court were to assume that Brothers possessed this awareness, Derosena's claims would still fail. The eighteen month lapse between the January 2005 EEOC filing and the July 2006 probation is insufficient, standing alone, to create a triable issue. *See, e.g., Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) (one-month gap between filing EEOC charge and termination insufficient to establish retaliation); *EEOC v. Yellow Freight Sys.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (en banc) (six-week gap between filing of EEOC charge and termination insufficient). Similarly, if one were to adopt the unreasonable assumption that Brothers knew of the right to sue letter on June 9, the seven week time lapse, standing alone, would not support a reasonable inference of causation. *See, e.g., Contreras*, 237 F.3d at 765.

Finally, Derosena's argument that she received a "clean slate" after her December 2004 probation and did not receive a written warning in 2006 prior to the probation is also unavailing for several reasons. First, as noted above, Derosena has presented no evidence from which one could infer that Brothers was aware of the January 2005 charges in July 2006. Second, Derosena's suggestion that she earned a "clean slate" after her December 2004 probation that remained untarnished under her July 2006 probation is not supported by the record. To the contrary, both Evans and Brothers continued to comment on Derosena's deficiencies during the interim period. Third, while the July 2006 Corrective Action Form does not reference any formal written warnings regarding the January, February, May, or June 2006 incidents, Derosena herself admitted that she did receive communications regarding the February 2006 processing error and could not recall whether she received communications regarding the May 2006 incident. Fourth, even if the Court were to assume that Derosena had not received prior communication regarding the errors, Derosena has presented no evidence to establish that Brothers was required to or had a practice of issuing written warnings prior to placing an employee on probation. Thus, even the absence of written warnings would be evidence of nothing. Finally, it is undisputed that Derosena committed the January, February, May, or June 2006 errors that served as the stated reasons for Derosena's probation. In light of such evidence, any failure to issue written warnings prior to the July 2006 probation would not be circumstantial evidence of retaliation.

Thus, for the reasons stated above, Defendants' motion for summary judgment as to Derosena's retaliation claims is granted with respect to the July 2006 probation.

*ii. October 27, 2006 Probation*

Derosena submits that she has proffered sufficient evidence of "coincidental timing" to satisfy her burden at summary judgment. Specifically, Derosena contends that Defendants placed Derosena on probation approximately four and one-half months after she received her right to sue letter and six weeks after she instituted the current action on September 11, 2006. As discussed above, the issuance and receipt of the June 9 right to sue letter is not circumstantial evidence of retaliation. Thus, the Court will limit its analysis to the Derosena's arguments regarding the September 11, 2006 lawsuit.

As a preliminary matter, the Court must establish who held the final decisionmaking authority with respect to the October 27, 2006 probation. The "decisionmaker is the person 'responsible for the contested decision.'" *Rogers*, 320 F.3d at 754 (*quoting Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997)). Where the decisionmaker essentially "rubber-stamp[s]" a biased employee's employment recommendation and acts as the employee's "cat's-paw," the employee's retaliatory motive may, in some circumstances, be imputed to the decisionmaker. *See id.*; *David v. Caterpillar, Inc.*, 324 F.3d 851, 860-61 (7th Cir. 2003). In this case, while Brothers followed Trotter and Reid's recommendation to extend Derosena's probation (rather than terminate her), the evidence presented suggests that Brothers, rather than Trotter and Reid, was functionally responsible for the decision. Significantly, Brothers concluded, prior to approaching Trotter and Reid, that Derosena should be discharged from her job because her performance had not improved during the July 2006 probation. Only after she arrived at this conclusion did she speak with Trotter and Reid. There is no evidence to suggest that Reid or Trotter had a retaliatory motive, that Brothers based her decision solely on information supplied be Reid and Trotter, or that Reid and Trotter either supplied Brothers with false information or failed to provide

her with relevant information.  *See id.*  Given Brothers' prior independent assessment that Derosena's work performance had declined and her conclusion that Derosena should be terminated, it would be unreasonable to conclude that Brothers merely "rubber-stamped" Reid and Trotter's suggestion.  Thus, the only remaining question is whether Brothers' decision to extend Derosena's probation was retaliatory.  For the reasons stated below, the Court concludes that Derosena has failed to present a triable issue as to this point.

Derosena has failed to provide any evidence from which one could infer that Brothers was aware of the January 2005 charge (through Derosena's receipt of a right to sue letter or otherwise) or the September 11 lawsuit when she concluded that Derosena had not improved during the probationary period and recommended termination.  Given the complete dearth of evidence regarding Brother's awareness prior to her conversation with Reid and Trotter, a reasonable trier of fact could not conclude that Brothers' subsequent decision to place Derosena on probation was retaliatory.  *See Luckie*, 389 F.3d at 715.  Nor would any subsequent discovery of the discrimination claims serve as circumstantial evidence of causality.  Brothers' concluded that Derosena should be terminated prior to her conversation with Reid and Trotter; thus, Brothers' decision to "proceed[] along lines previously contemplated," albeit to a lesser degree, is not evidence of causation.  *See Clark County Sch. Dist.*, 532 U.S. at 273 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

Second, even if the Court were to assume that Brother's had knowledge of the January 2005 EEOC charge, the June 9, 2006 right to sue letter, or the September 11, 2006 lawsuit, Derosena's reliance on temporal proximity, standing alone, does not create a triable issue.  Although a causal

link may be established by a showing that the adverse conduct occurred closely following a protected activity, if the time between the protected activity and the adverse action becomes too great, "additional proof of a causal nexus is necessary." *Oest*, 240 F.3d at 616 (internal quotations omitted). Here, the twenty-one month time lapse following the January 2005 charge, the three month lapse subsequent to the right to sue letter, and six week lapse from the date of the lawsuit do not present the contemporaneous proximity necessary to establish the causation requirement of a *prima facie* case of retaliation. *See Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 904-05 (7th Cir. 2005) (one-month gap insufficient); *Contreras*, 237 F.3d at 765 (one-month gap insufficient); *Yellow Freight Sys.*, 253 F.3d at 952-53 (six-week gap insufficient).

Finally, while neither party addresses the issue, the Court notes that Reid and Trotter's dual justification for recommending probation rather than termination does not create a genuine issue of material fact. As noted above, there is no evidence to suggest that Brothers based his decision solely on information supplied be Reid and Trotter or that Reid and Trotter provided Brothers with false information. Instead, Reid and Trotter recommended the extended probation rather than termination to give Derosena another opportunity to improve and because of the discrimination charge against Evans. Such evidence suggests an attempt by Reid and Trotter to ensure that Derosena was given yet another opportunity to improve, not retaliatory motivation.

*iii. December 18, 2006 Termination*

Similar to the July 2006 and October 2006 probations, Derosena contends that her testimony regarding her performance combined with "suspicious timing" between her December 18, 2006 termination and her January 2005 charge, June 9 right to sue letter, and September 2006 lawsuit satisfies Derosena's burden at the summary judgment. For the reasons stated above, the intervening

passages of time, which range from approximately three months to two years, are insufficient to defeat summary judgment standing alone. In a similar vein, if one were to assume that Brothers initially learned of the discrimination charge during her October 2006 meeting with Reid and Trotter, the approximate seven-week lapse would also be insufficient standing alone. *See Kodl*, 490 F.3d at 563; *see also Contreras*, 237 F.3d at 765; *Yellow Freight Sys.*, 253 F.3d at 952-53.

Nor does Derosena's denial of responsibility with respect to the $518, 000 processing error stave off dismissal. Derosena's appears to argue, albeit in a convoluted manner, that the Board's proffered reasons for her termination are pretextual. While pretext may serve as circumstantial evidence of retaliation, s*ee Hemsworth,* 476 F.3d at 491, Derosena has failed to present evidence to suggest that the decision to terminate was tainted by retaliatory animus. "The issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *Wade v. Lerner N.Y., Inc.*, 243 F.3d 319, 323 (7th Cir. 2001). "[I]f [the decisionmaker] 'honestly believed in the nondiscriminatory reason[] it offered,' it is irrelevant whether [the decisionmaker] disciplined [the plaintiff] for an infraction she did not actually commit." *Id.* (*quoting Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997)).

Drawing on these principles, Derosena must demonstrate that Trotter[15] did not honestly believe the reasons given for Derosena's termination. The record is void of any such evidence. While Derosena disputes her fault as to the $518,000 processing error, she does not dispute that the

---

[15] Neither party identifies who ultimately decided to terminate Derosena. The Court notes that Brothers' Termination Memorandum reflects that the recommendation was addressed to Trotter. (Def. Ex. C, Derosena Dep. Ex. 18, Termination Memo.) Additionally, in October 2006, Brothers, pursuant to Board policy, discussed his initial termination recommendation with Trotter and Reid. Thus, the Court will assume for the purposes of summary judgment that Trotter made the ultimate decision to terminate Derosena.

error occurred, nor has she offered any evidence to suggest that Brothers, Trotter or Reid did not honestly believe in Brothers' presentation of the facts. To the contrary, Derosena's own explanation regarding the processing error – specifically, that Brothers thought Derosena was responsible because Derosena's electronic initials were the last initials left on the account – suggests that Brothers' belief was, at best, honest and mistaken. Additionally, the Court notes that Derosena has failed to present any evidence or argument to refute the Defendants' additional proffered reasons for termination, including Brothers' concern regarding Derosena's inability to correct her job performance issues and failure to work with Brothers to correct the $518,0000 error. As noted above, Brothers initially warned Derosena in July 2006 that a failure to improve her job performance during her probation could result in termination. Subsequently, in October 2006, Brothers recommended that Derosena be terminated because she did not believe Derosena's performance had improved. Thus, in light of Brothers' continuos concerns and the absence of evidence indicating that the stated concerns in December were pretextual, Derosena has failed to present evidence indicating that Brothers' additional reasons were tainted by retaliatory animus. *See Wade*, 243 F.3d at 323; *Morris v. Jewel Food Stores, Inc.*, No. 01 C 2099, 2003 U.S. Dist. LEXIS 9091, at *18-19 (N.D. Ill. May 30, 2003).

Without any evidence to support Derosena's allegations of retaliation, it is not for this Court to second-guess the Board's business judgement. *Wade*, 243 F.3d at 325 ("[W]e will not sit as a 'superpersonnel department' debating the merits of legitimate, non-discriminatory criteria a business chooses to employ."). Because Derosena has failed to present evidence from which one could reasonably infer pretext, Derosena's dispute with respect to her responsibility for the $518,000 error is insufficient to create a genuine issue of material fact as to causality.

*B. Indirect Method*

Because Derosena has no direct evidence of retaliation, she must satisfy the burden-shifting analysis set forth under the indirect method of proof. Under this approach, the plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Sitar*, 344 F.3d at 728 (*citing Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002)). The failure to satisfy one element of this prima facie case is "fatal" to the retaliation claim. *Sublett*, 463 F.3d at 740 (*citing Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)). If the plaintiff establishes these four elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action. *Sitar*, 344 F.3d at 728 (*citing Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002)). If the defendant does so, the burden then shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.* While the burden of production shifts between the parties under this method, "'the burden of persuasion rests at all times on the plaintiff.'" *Id.* (*quoting Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003)). The Court need not delve into an intricate analysis of the indirect method, as Derosena has failed to present any evidence to meet the fourth prong of her *prima facie* case.

As noted above, a similarly situated individual is one who is "'directly comparable in all material respects.'" *Sublett,* 463 F.3d at 740 (7th Cir. 2006) (*quoting Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004)). While Derosena devotes five pages of her response brief to the "similarly situated" analysis, she does not identify much less present any argument or

evidence in an effort to establish that similarly situated individuals who did not engage in the statutorily protected activity were treated more favorably.[16]  Accordingly, Derosena's retaliation claims cannot withstand summary judgment under the indirect method of proof.  *Id.* at 740-41*; see also Kampmier*, 472 F.3d at 940 (summary judgment is appropriate on a retaliation claim when plaintiff fails to identify similarly situated individuals).

Because Derosena has failed to establish a triable issue with respect to her retaliation claims under the direct or indirect methods of proof, the Court grants Defendants summary judgment as to the retaliation claims asserted in Counts III and IV.

## CONCLUSION AND ORDER

For the reasons stated herein, Defendants' Motion for Summary Judgment is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: May 30, 2008

---

[16]As noted above, Derosena testified that she believed Gallardo and Kucharik should have been terminated, rather than disciplined, for making mistakes. (Pl. 56.1 Resp. ¶ 66.)  Conclusory assertions that are unsupported by specific facts are insufficient to create a genuine issue of triable fact.  *See, e.g., Sublett,* 463 F.3d at 740.  Thus, Derosena's speculation as to the propriety of Gallardo's and Kucharik's discipline will not stave off summary judgment.